**SO ORDERED.**

**SIGNED this 16th day of May, 2013.**





THOMAS W. WALDREP, JR.
UNITED STATES BANKRUPTCY JUDGE

---

## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| CLEAN BURN FUELS, LLC, | ) | Case No. 11-80562 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| CLEAN BURN FUELS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 11-09046 |
| | ) | |
| v. | ) | |
| | ) | |
| PURDUE BIOENERGY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### <u>MEMORANDUM OPINION</u>

Before the Court are cross motions for partial summary judgment filed on January 24,

2013, one filed by the Chapter 7 trustee for Clean Burn Fuels, LLC (the "Trustee Motion") and

the other filed by Perdue BioEnergy, LLC (the "Perdue Motion").  In November of 2009, Clean

Burn Fuels, LLC (the "Debtor") and Perdue BioEnergy, LLC ("Perdue") entered into a series of agreements regarding the supply and delivery of corn to the Debtor's ethanol plant. Perdue supplied corn to the plant until the plant closed in early 2011.  Thereafter, the Debtor filed a Chapter 11 bankruptcy petition and initiated this adversary proceeding, which seeks a declaratory judgment that the corn being housed in the bins at the Debtor's plant (the "Corn") was property of the estate. The case was converted to Chapter 7 in 2012, and Sara A. Conti, Chapter 7 trustee (the "Trustee") was substituted for the Debtor in this adversary proceeding.

The Trustee Motion contends that even though the contracts between the Debtor and Perdue provide that Perdue is the owner of the Corn, because the Corn was delivered to the Debtor, the Uniform Commercial Code limits Perdue to the retention of a security interest in the Corn.  Furthermore, because Perdue did not perfect a security interest in the Corn, its interest is avoidable pursuant to Section 544. The Perdue Motion asserts that delivery to the Debtor did not occur until the Corn was removed from the bins and crossed a weighbelt. Therefore, because the Corn remained in the bins, Perdue retained possession and ownership of the Corn.  Perdue also seeks summary judgment on the Trustee's breach of contract claim, asserting that it had a right to setoff that cannot be avoided by the Trustee.

Upon consideration of the pleadings and the statements of counsel, and for the following reasons, the Court concludes that the Corn is property of the estate, Perdue holds an unperfected security interest in the Corn and its proceeds, and the Trustee may avoid Perdue's unperfected security interest pursuant to Section 544(a) of the Bankruptcy Code. As to Perdue's right of setoff, the Court concludes that there are material facts in controversy.  Thus, the Trustee Motion will be granted and the Perdue Motion denied.

<u>I. FACTS</u>

**A.  The Ethanol Plant**

The Debtor owned and operated an ethanol plant in Raeford, North Carolina, for the production and sale of ethanol. (Pl.'s Br. Ex. L, Ex. J.) On March 31, 2008, the Debtor entered into a credit agreement with Cape Fear Farm Credit, ACA ("Cape Fear") that provided up to $63,000,000.00 in term loans for construction of the ethanol plant and a $6,000,000.00 revolving line of credit for working capital after construction. (Cape Fear POC.)  To secure the loans, Cape Fear perfected a lien encumbering all of the Debtor's assets, including the Debtor's real property and personal property. (Cape Fear POC.)

The ethanol plant consists of multiple structures. (Pl.'s Br. Ex. H, Def.'s Br. Ex. 33.) The first building on the road leading into the Debtor's real property is an administrative building. (Pl.'s Br. Ex. H, Def.'s Br. Ex. 33.) The administrative building provided, <u>inter alia</u>, office space for a Perdue employee who procured corn locally and monitored and maintained the corn in inventory.  (Pl.'s Br. Ex E § 2(d)(iv), Pl.'s Ex. M.)  Train tracks run parallel to the road and lead into a building that houses receiving pits. (Pl.'s Br. Ex. H, Def.'s Br. 33.)  The building housing the receiving pits also contains switches that control the electricity in the plant and can be locked in an off position.  (Pl.'s Br. Ex. M.)  Conveyor belts run from the receiving pits to two large bins designed to hold 1.4 million bushels of corn.  (Pl.'s Br. Ex H, Def.'s Br. Ex. 33.)  An additional set of conveyor belts run from the storage bins into the plant; at the end of these belts is the weighbelt. (Def.'s Br. Ex. 1-A ¶ 27(f).) After crossing the weighbelt, corn is deposited into machinery, and the ethanol production process begins.[1] (Def.'s Br Ex 1-A ¶ 27(h).)

---

[1]The ethanol plant was designed to produce up to 60,000,000 gallons of ethanol per year, requiring 22 million bushels of corn per year, or 1.8 million bushels per month. (Pl.'s Br. Ex. E.) As a byproduct of processing corn into ethanol, the Debtor also produced and sold dried

**B. The Agreements**

Initially, the Debtor intended to obtain corn through suppliers that would effectively act as brokers for the corn. (Def.'s Br. Exs. 7, 8.)  However, in late 2008, Perdue and the Debtor discussed an arrangement whereby Perdue would supply the Debtor with all of the corn required for its ethanol production.  (Def.'s Br. Ex. 5.)  Perdue proposed a model that differed from a typical brokerage agreement. (Def.'s Br. Ex. 6.) The terms of the proposal provided that Perdue would source all of the corn required for the Debtor's operation, provide logistics for the transportation of the corn to the plant, provide support for corn handling and storage, retain ownership of the corn until it was transferred from the leased bins, and purchase all of the DDGS produced at the plant.  (Def.'s Br. Exs. 9, 10.)  This model was designed to reduce the amount of working capital and manpower necessary for the Debtor's operations, in part because the Debtor would not have to hire employees to manage transportation logistics. (Def.'s Br. Ex. 2, 17.) Following these discussions, Cape Fear required the Debtor either to enter into contracts with Perdue for the supply of corn or raise an additional $7,000,000.00 in equity.  (Def.'s Br. Ex. 15.)

On November 2, 2009, the Debtor and Perdue entered into multiple agreements to arrange for the sourcing of corn, consisting of the Feedstock Agreement, the Co-Products Agreement, and the Master Agreement (collectively, the "Agreements").  (Pl.'s Br. Exs. E, F, G, Def.'s Br. Exs. 18, 19, 20.)  The Feedstock Supply Agreement provided that the Debtor would buy corn exclusively from Perdue and that Perdue would sell and deliver all of the corn needed by the Debtor for ethanol production.  (Pl.'s Br. Ex. E at RECITALS ¶B.) Under the Feedstock Supply Agreement, a minimum of 600,000 bushels, the equivalent of ten days' worth of

---

distillers grains with solubles ("DDGS"), which are made from the ground corn and are used as livestock and poultry feed. (Pl.'s Br. Exs. L, J.)  By contract, the Debtor sold all ethanol to C&N Ethanol Marketing Corporation and all DDGS to Perdue. (Pl.'s Br. Exs. L, J.)

4

inventory, would be maintained at the ethanol plant.  (Pl.'s Br. Ex. E at § 2(c).)  The Feedstock

Supply Agreement further provided that Perdue would manage the logistics relating to the

origination and delivery of corn to the plant.  (Pl.'s Br. Ex. E at § 2(d).)  Pursuant to the

Feedstock Supply Agreement, delivery of the corn was "complete once Perdue delivers the

[corn] to [the Debtor's] site."  (Pl.'s Br. Ex. E at § 7.)  It further provided that, with respect to

rail deliveries, "Perdue shall deliver the Corn sold to [the Debtor] free on board (FOB) the

loading origin set forth on the rail bill of lading."  (Pl.'s Br. Ex. E at § 7.)  The Debtor would

provide storage space in the form of bins, to be leased to Perdue.  (Pl.'s Br. Ex. E at § 2(c).)

Pursuant to the Feedstock Supply Agreement, Perdue would retain ownership of the corn in the

storage bins until it crossed the weighbelt inside the plant.  (Pl.'s Br. Ex. E at § 7.)  Perdue was

allowed access to the bins to inspect the corn and to prevent anyone else from obtaining

possession of the corn, which could be done by cutting power to the equipment.  (Pl.'s Br. Exs.

E, H.) Perdue's full time on-site employee had access to the ethanol plant and the administration

building.  (Def.'s Br. Ex. 43.)

The Feedstock Supply Agreement was intended to be effective for three years from the

"start-up date."  (Pl.'s Br. Ex. E.)  The Master Agreement defined "start-up date" as "the date

identified in a written notice delivered by [the Debtor] to Perdue as the date on which [the

Debtor] will require Feedstock for the purpose of producing Ethanol and/or Co-product, which

date is intended to be the date of the commencement of services under the Goods and Services

Agreements."  (Pl.'s Br. Ex. F at § 1(a).)  In other words, the "start up date" would be

determined upon a notice given by the Debtor at a future time.  All notices were required to be

delivered to Perdue's general counsel. (Pl.'s Br. Ex. F at § 11(b).)

On June 8, 2010, the Debtor and Perdue executed a lease of the storage bins (the "Lease"), which was not recorded.  (Pl.'s Br. Ex. H, Answer at ¶ 53).  The Lease provided that Perdue would lease the two bins located on the Debtor's property for $1.00 per year.  (Pl.'s Br. Ex. H at § 1.2.)  Pursuant to the Lease, the Debtor was "to place notices on the Bins or otherwise display notice at the Ethanol Facility in such a manner that is reasonably sufficient to notify third-parties that the Bins have been designated exclusively to receive and store Feedstock owned by [Perdue], and that any Feedstock stored in such Bins are property of [Perdue] and not of [the Debtor]." (Pl.'s Br. Ex. H at § 1.3.)  On June 25, 2010, Perdue paid the $1.00 rental payment due under the Lease. (Def.'s Br. Ex. 36 at ¶ 6.)  No signs were ever erected on or near the bins.  (Pl.'s Br. Exs. L, J.) The parties intended for the Lease to remain in effect for the term of the Feedstock Supply Agreement. (Pl.'s Br. Ex. H at § 1.1.) However, the Debtor did not provide the notice that, pursuant to the Master Agreement, would trigger the start up date.  (Pl.'s Br. Ex. K.)

Also, on June 8, 2010, Perdue and Cape Fear entered into a Subordination, Attornment and Non-Disturbance Agreement, which subordinated Perdue's rights under the Lease to Cape Fear's lien. (Def.'s Br. Ex. 35 at § 1.)  The Subordination Agreement provides that Cape Fear recognizes that Perdue would retain ownership of the corn prior to the point of transfer defined in the Lease.  (Def.'s Br. Ex. 35 at § 1.)  The Subordination Agreement further provides that any foreclosure on the real property by Cape Fear would not interfere with Perdue's right to remove the corn under the Lease.  (Def.'s Br. Ex. 35 at § 3.)

On July 8, 2010, the Debtor entered into a transportation contract with Aberdeen and Rockfish Railroad Company and Norfolk Southern Railroad Company, which established the transportation pricing of corn to the rail site adjacent to the ethanol plant. (Pl.'s Br. Ex. N.)

Generally, Perdue would purchase corn from shippers in the Midwest. (Pl.'s Br. Ex. Q.) With respect to rail deliveries, Perdue would pay for the shipment upon receipt of properly submitted bill of lading, and weight and grade certificates for that shipment. (Pl.'s Br. Exs. Q, R.) Once the bill of lading was released, Norfolk Southern would remove the railcar from the tracks at the shipper's place of business, and transport the railcar to a rail interchange in Fayetteville, North Carolina. (Pl.'s Br. Ex. S.) There, Norfolk Southern would transfer the railcar to Aberdeen and Rockfish, which would then transport the rail car to the ethanol plant. (Pl.'s Br. Ex. S.) The train tracks led directly onto the Debtor's land and into a building containing receiving pits for the corn delivered by rail car. (Pl.'s Br. Ex. L.) Trucks delivering corn were weighed once upon arrival at the ethanol plant and again after depositing the corn in the receiving building to determine the amount of corn delivered. (Pl.'s Br. Ex. L.) Although Perdue was responsible for paying all freight charges for rail deliveries, such charges were ultimately incorporated into the purchase price of the corn, as the price was calculated using a formula based on the market price of corn plus a $0.025 per bushel charge. (Pl.'s Br. Ex. E at Exhibit A.)

## C. The Operation of the Plant

The Feedstock Supply Agreement required the Debtor to provide the labor necessary to unload, grade, and test the corn and either accept or reject the corn at the time of unloading. (Pl.'s Br. Ex. E at § 2(c).) Generally, the Debtor would inspect and test the corn to ensure its quality;[2] however, the Debtor did not test all rail deliveries because they were graded and tested at the point of origin. (Pl.'s Br. Ex. L.) After being deposited into the receiving bins, the Debtor's employees would transfer the corn, via the conveyor belts, into the bins. (Pl.'s Br. Ex. J.) The Debtor monitored and maintained the bins and the corn stored therein. (Pl.'s Br. Ex. J.)

_____

[2]The Debtor was required to accept all corn complying with the standards set forth in the Feedstock Supply Agreement. (Pl.'s Br. Ex. E at § 12(a).)

During this time, the Debtor did not purchase corn from any other supplier, and the only corn stored at the ethanol plant was that delivered by Perdue pursuant to the Agreements. (Pl.'s Br. Exs. L, J.) The first shipments of corn, totaling 9,000 bushels, were delivered to the Debtor by truck on February 4 and 5, 2010. (Pl.'s Br. Ex. X.) On June 15, 2010, 87,500 bushels were delivered by rail. (Pl.'s Br. Ex. X.) However, shipments may have been released on May 3, 2010, May 5, 2010, and May 11, 2010. (Pl.'s Br. Ex. X.) Perdue did not file a UCC-1 financing statement with respect to the corn. (Answer at ¶ 38.)

The Debtor anticipated that production would begin in early 2010. (Def.'s Br. Exs. 27, 28, 29.) However, due to delays in construction, production did not begin until mid-2010. (Def.'s Br. Ex 32.) The Debtor first began producing ethanol in August of 2010. (Pl.'s Br. Ex. L at ¶ 27.) Prior to that, the Debtor did not remove corn from the bins. (Pl.'s Br. Ex. L at ¶ 27.)

As the plant began producing ethanol, the Debtor's employees removed corn from the bins via the conveyor belts. (Pl.'s Br. Ex. J.) The corn was weighed upon crossing the weighbelt to determine the amount used. (Pl.'s Br. Exs. L, J.) The Debtor was not required to pay for the corn until then.[3] (Pl.'s Br. Ex. E at §5(a), Def.'s Br. Ex. 14, 48, 49, 50, 54.) The Debtor removed corn as needed, without requesting permission; however, Perdue maintains that permission was implicit in its failure to stop the removal. (Pl.'s Br. Exs. J, M, Def.'s Br. Ex. 44.)

**D. The Bankruptcy of the Debtor**

Due to the high cost of corn in comparison with the market value of ethanol, the Debtor began to lose money. (Pl.'s Br. Ex. J at ¶ 37.) The Debtor defaulted in payment to Perdue in

---

[3]Every Monday, Perdue would send invoices for the corn used during the prior week, and the Debtor was obligated to pay fifteen percent of the invoice on Tuesday and the remaining balance on Friday. (Pl.'s Br. Ex. E at §5.) The first invoice sought payment for corn used from August 13, 2010 to August 16, 2010, totaling $422,298.90. (Pl.'s Br. Exs. L, AA, Z.)

February of 2011.  (Def.'s Br. Ex. 1 at ¶¶ 31, 32.) The Debtor stopped producing ethanol, and consequently, stopped using corn, on February 28, 2011.  (Pl.'s Br. Ex. J.) About that time, Perdue's on-site employee padlocked the electrical switch to the conveyor belt, effectively preventing anyone from removing corn from the bins.  (Def.'s Br. Exs. 1, 59, 60, Pl.'s Resp. Br. Exs. FF, BB.)

On April 3, 2011, the Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code. On May 2, 2011, Perdue moved for relief from the automatic stay, seeking to recover the 553,000 bushels of Corn. That same day, the Debtor initiated this adversary proceeding by filing a complaint.  On May 10, 2011, the Court entered a consent order allowing Perdue to remove the Corn and sell it.  The Debtor cut a hole in the conveyor belt leading from the bins in order to allow the Corn to be removed.  (Pl.'s Br. Ex J at ¶43.)  The sale of the Corn, after deduction of all associated costs, produced proceeds of $4,813,052.00.  On June 20, 2011, the Court denied the motion for relief from stay because the issues raised in the motion were more properly addressed in this adversary proceeding.  (Pl.'s Br. Ex. V.)

**E.  The Adversary Proceeding**

On July 20, 2011, the Trustee filed an Amended Complaint asserting seven claims for relief.  Count 1 seeks a declaratory judgment that the Corn and its proceeds are property of the estate.   Count 2 seeks a determination of Perdue's interest in the Corn.   Count 3 seeks a determination of Cape Fear's interest in the Corn.[4]  Count 4 seeks to avoid the Lease under Section 544(a).  Count 5 seeks to avoid Perdue's unperfected security interest or lien on the Corn pursuant to Section 544(a).  Count 6 seeks to recover the corn because it is property of the estate.  Finally, Count 7 asserts a claim for breach of contract due to Perdue's failure to pay for DDGS

---

[4]This count has been dismissed.  (Pl.'s Br. Ex. D.)

purchased by Perdue between February 28, 2011 and March 30, 2011. As to Count 7, the Amended Complaint also asserts that Perdue has no right to set off because, during that period, Perdue incurred the debt for the purpose of obtaining a setoff right. On September 19, 2011, the Court entered an order approving a settlement in which Cape Fear waived any security interest that it had in the Corn and its proceeds. (Pl.'s Br. Ex. D.)

Following a period of extensive discovery, on January 24, 2013, both parties filed motions for partial summary judgment. The Trustee Motion seeks summary judgment as to Counts 1, 2, 4, 5, and 6. The Trustee argues that, applying the Uniform Commercial Code, a completed sale occurred upon delivery of the Corn, leaving Perdue with a only a security interest. Specifically, under N.C. Gen. Stat. § 25-2-401, because the Feedstock Supply Agreement determines when delivery is complete, Perdue's reservation of title to the Corn is limited to a reservation of a security interest. Consequently, because Perdue did not perfect its security interest in the Corn, it is property of the estate, and the Trustee may avoid Perdue's interest. Alternatively, the Trustee argues that if Perdue's reservation of title is valid, the transaction would constitute a consignment.

The Perdue Motion seeks partial summary judgment as to Counts 1, 2, 4, 5, 6 and 7. Perdue contends that N.C. Gen. Stat. § 25-2-401(1) does not apply to the Corn because it was not delivered to the Debtor until it crossed the weighbelt, at which time possession and title passed to the Debtor. Perdue further argues that the Feedstock Supply Agreement and the Lease demonstrate that Perdue retained ownership of the Corn until it passed over the weighbelt. Perdue's position focuses on when the sale–that is, the obligation to pay–occurred, essentially asserting that the passing of title defines delivery. As to Count 7, Perdue argues that the Trustee

is unable to provide any evidence of the requisite intent because Perdue was contractually obligated to purchase and accept the DDGS.

## II. JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina. This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (K), and (M), which this Court has the jurisdiction to hear and determine.

Pursuant to the analysis in <u>Stern v. Marshall</u>, 564 U.S. --, 131 S. Ct. 2594 (2011), the Court may enter a final order in this matter. "There can be no dispute that this Court has the authority to determine what is and is not property of the Debtor's bankruptcy estate and enter final orders regarding the same." <u>Burns v. Dennis (In re Southeastern Materials, Inc.)</u>, 467 B.R. 337, 352-52 (Bankr. M.D.N.C. 2012) (citing <u>In re BankUnited Fin. Corp.</u>, 462 B.R. 885, 893-94 (Bankr. S.D. Fla. 2011); <u>In re Washington Mutual, Inc.</u>, 461 B.R. 200, 217 (Bankr. D. Del. 2011)).

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, directs a court to grant a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). <u>See also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (explaining that Rule 56 mandates the granting of summary judgment against a party who fails to establish an essential element of the asserted claim).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-9 (1986). "A genuine issue of material fact exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party." Cosey v. Prudential Ins. Co. of Am., --- F.Supp. 2d ---, 2012 WL 4581454, at *4 (M.D.N.C. Sept. 30, 2012) (citing Anderson, 477 U.S. at 248-9). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Celotex, 477 U.S. at 323. The party opposing summary judgment must offer specific facts or objective evidence that a genuine issue of material fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-6 (1986).

When considering a motion for summary judgment, a court must view the facts, and any reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255; Bryant v. Bell Atl. Md. Inc, 288 F.3d 124, 132 (4th Cir. 2002). When deciding cross motions for summary judgment, a court reviews "each motion separately on its own merits." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003).

## IV. LEGAL ANALYSIS

### A. Parol Evidence

The Trustee and Perdue take different views on when delivery of the Corn occurred. The Trustee argues that the definition in the Feedstock Supply Agreement is the final expression of the parties' intent; delivery of the Corn was "complete once Perdue delivers the [corn] to [the Debtor's] site." (Pl.'s Br. Ex. E at §7). Perdue argues that the parties did not intend delivery to occur until the Corn crossed the weighbelt and seeks to offer deposition testimony to that effect. Thus, as a threshold issue, the Court must determine whether additional information should be considered to determine the intent of the parties when drafting the contract language.

The Parol Evidence Rule is not an evidentiary rule at all.  It is a substantive common law rule that excludes prior or contemporaneous oral agreements that are inconsistent with a written contract if the written contract encompasses the complete agreement of the parties.  Phelps-Dickson Builders, L.L.C. v. Amerimann Partners, 172 N.C. App. 427, 436, 617 S.E. 2d 664, 670 (2005); see also Ivey v. Wilson (In re Payne), 2006 WL 3524442, at * 14-15 (Bankr. M.D.N.C. Dec 6, 2006) (holding that parol evidence was inadmissible to contradict the terms of a security agreement and promissory note); Godfrey v. Res-Care, Inc., 165 N.C. App. 68, 76, 598 S.E.2d 396, 402 ( 2004) (citing N.C. Gen. Stat. § 25-2-202 in support of the proposition that "[t]he parol evidence rule prohibits the admission of evidence of prior oral agreements 'to vary, add to, or contradict [the terms of] a written instrument intended to be the final integration of the transaction.'").  The Parol Evidence Rule is codified in North Carolina, as follows:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
> (a) by course of dealing or usage of trade (G.S. 25-1-205) or by course of performance (G.S. 25-2-208); and
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

N.C. Gen. Stat. § 25-2-202.  Thus, "in the absence of fraud or mistake or allegation thereof, parol testimony of prior or contemporaneous negotiations or conversations inconsistent with the writing, or which tend to substitute a new and different contract from the one evidenced by the writing, is incompetent."  Huttenstine v. Mast, 537 F. Supp. 2d 795, 802 (E.D.N.C. 2008) (quoting Neal v. Marrone, 239 N.C. 73, 77, 79 S.E.2d 239, 242 (1953).

If the writing is intended as a complete and exclusive statement of the terms of the agreement, then the writing alone constitutes the contract.  1 White & Summers, Uniform

Commercial Code § 3:13 (6th ed. 2012).  A merger clause stating that the writing is complete and exclusive can demonstrate that the writing was intended to be the final agreement.  Id. at § 3:14.  The statute allows parties to introduce course of dealings, usage of trade, or course of performance to explain or supplement a writing.  N.C. Gen. Stat. § 25-2-202(a). However, a specific merger clause may be used to exclude evidence of course of dealing, usage of trade, or course of performance to explain or supplement a writing.  1 White & Summers, Uniform Commercial Code § 3:16 (6th ed. 2012).

Moreover, if the contract is ambiguous, a court may consider parol evidence where  the "relevant contractual language is fairly and reasonably susceptible to multiple constructions." Glover v. First Union Nat'l Bank, 109 N.C. App. 451, 456, 428 S.E.2d 206, 209 (1993) (citing St. Paul Fire & Marine Ins. Co. v. Freeman-White Assoc., Inc., 322 N.C. 77, 83, 366 S.E.2d 480, 484 (1988)).  "The trial court's determination of whether the language in a contract is ambiguous is a question of law."  Duke Energy Corp. v. Malcolm, 178 N.C. App. 62, 65, 630 S.E.2d 693, 695 (2006) (citing Bicket v. McLean Sec., Inc., 124 N.C. App. 548, 553, 478 S.E.2d 518, 521 (1996), disc. review denied, 487 S.E.2d 538, 346 N.C. 275 (1997)), aff'd, 361 N.C. 111, 637 S.E.2d 538 (2006)).

Section 11(h) of the Master Agreement specifically provides that "[n]o course of prior dealings between the Parties, and no usage of trade, except where expressly incorporated by reference, shall be relevant or admissible to supplement, explain, or vary any of the terms of this Master Agreement, the Goods and Services Agreements or the Confidentiality Agreement even though the accepting and acquiescing Party has knowledge of the nature of the performance and an opportunity to object."  (Pl.'s Br. Ex. F. at § 11(h).)

Although the two parties have different interpretations of Section 7 of the Feedstock Supply Agreement, the language of the Feedstock Supply Agreement is clear and unambiguous in stating that delivery is complete, at the latest, when the corn arrives at the Debtor's site. Therefore, the Parol Evidence Rule prohibits the parties from introducing evidence to supplement the final agreement. Such evidence was admitted without objection, but the Court cannot consider the deposition testimony in interpreting the parties' contracts.[5]

## B. Perdue's Interest in the Corn

### 1. The Uniform Commercial Code Applies

When hearing a case under diversity jurisdiction, federal courts apply the law of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78-79 (1938). This doctrine extends to bankruptcy courts in situations where the Bankruptcy Code incorporates state law issues. In re Poli, 298 B.R. 557, 561 (Bankr. E.D. Va. 2003). Thus, "in the absence of a compelling federal interest which dictates otherwise, [state law applies] where a federal bankruptcy court seeks to determine the extent of a debtor's property interest." In re Merritt Dredging Co., Inc., 839 F.2d 2013, 206 (4th Cir. 1988). See also Butner v. United States, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law."). Accordingly, North Carolina law applies and must be interpreted.

---

[5]Because the ultimate issue in this case is the interpretation of the contracts under U.C.C. § 2-401, it should be noted that at least one court has held that parties cannot use trade usage, course of dealings, or any other form of agreement to determine ownership in a manner different from that set out in U.C.C. § 2-401(1). See First Nat'l Bank S. Kan. v. Official Unsecured Creditors' Comm. (In re Wild W. World, L.L.C.), 2008 WL 4642266 at *4 (Bankr. D. Kan Oct. 17, 2008) ("Moreover, § 2-401(1) cannot be varied by custom and usage in the trade, course of dealing, or agreement.").

Article 2 of the North Carolina's version of the Uniform Commercial Code (the "U.C.C.") applies to transactions in goods and regulates the sale or transfer of ownership of goods. N.C. Gen. Stat. §§ 25-2-101, 25-2-102. The U.C.C. defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." N.C. Gen. Stat. § 25-2-105(1). The parties do not dispute that the Corn falls within the U.C.C. definition of "goods," so Article 2 of the U.C.C. applies to the transaction between the Debtor and Perdue.

Although Article 9 generally applies to transactions intending to create security interests, it also applies to sales transactions that create the same risks of secret liens as Article 9 transactions. Octagon Gas Sys., Inc. v. Rimmer, 995 F.2d 948, 954 (10th Cir. 1993) (stating that Article 9 applies to sales of accounts). "[C]ompliance with Article 9 is designed to ensure public notice of security interests." McCarthy v. BMW Bank of N. Am., 509 F.3d 528, 530 (D.C. Cir. 2007). One of the principle purposes of Article 9 is to enforce the policy against secret liens by demanding strict compliance with perfection requirements. Id. (citing Permanent Editorial Board Commentary for the U.C.C., Final Report No. 6, § 9-301(1) (Mar. 10, 1990)).

**2. The Policy of Article 2 of the Uniform Commercial Code**

The common law concept of title allows for subjective definition of title by the contracting parties. The legal rules regarding sales generally allow parties to freely enter into contracts. However, sale contracts cannot remain totally private between the contracting parties. Parties are required to structure transactions in certain conventionally recognized ways that provide notice to third parties. Jeanne L. Schroeder, Death and Transfiguration: The Myth that the U.C.C. Killed "Property", 69 Temp. L. Rev. 1281, 1298 (1996) Consequently, with regard to

16

the sale of goods, the U.C.C. intentionally shifts the focus from the common law concept of title to that of a security interest.

Originally, the drafters of Article 2 rejected title as a means to describe security interests covered within the Article.  Early drafts of Article 2 intended that a seller who sought to retain title to goods sold would retain a "security title."  U.C.C. § 2-104 (1949 Draft).  However, to be enforceable against third parties, the sales contract must be objectively observable by those parties who might be affected by the contract (i.e., other secured parties). Schroeder, supra, at 1317.

A security title under Article 2 was inconsistent with the security interest under Article 9 because title was insufficiently objective to serve the interests of third parties.  As a result, because title was too theoretical, the U.C.C. drafters focused on pragmatic solutions to marketplace situations, based on commercial reasonableness, intending transactions to be ruled by the contractual relationship between the parties, consistent with their expectations, but sensitive to third parties.  William L. Tabac, The Unbearable Lightness of Title Under the Uniform Commercial Code, 50 Md. L. Rev. 408, 409 (1991).  Eventually, the seller's security title under Article 2 was replaced with the security interest as defined in Article 9, reducing competing property claims to a determination of security interest priority rather than a determination of which party maintained title in the goods.  Tabac, supra, at 439.  U.C.C. § 2-401; see also 4 White & Summers, Uniform Commercial Code § 22-10 (6th ed. 2012) (passage of title is not determinative under the U.C.C.).

Article 2 security interests depend upon the debtor not having possession of the goods, because when the debtor does not have possession, it is unlikely that Article 2 liens will prejudice third parties.  4 White & Summers, Uniform Commercial Code § 22-10 (6th ed. 2012).

However, once the debtor obtains possession of the goods, an Article 2 creditor's claim is no different from the claim of any other consensual creditor under Article 9 and is dependent upon the traditional rules of attachment and perfection.  Id.  Thus, the seller who sells goods while purporting to retain a "security interest," without filing a financing statement, will be an unperfected creditor once the buyer obtains possession of the goods.  Id.

Property interests that are not open and notorious should be deemed constructively fraudulent against creditors. Schroeder, supra, at 1319. "[T]he presence or absence of externally observable and determinable facts and not the location of 'title,' controls the rights of the seller's creditors and of good faith purchasers from either the buyer or the seller."  Proposed U.C.C. § 2-401 cmt. 1 (quoted in Samuel Williston, The Law of Sales in the Proposed Uniform Commercial Code, 63 Harv. L. Rev. 561, 568 (1950)).  Although this earlier drafted comment was not ultimately included in the final version of the U.C.C., the draft supports the U.C.C.'s intent that the parties' agreed upon contractual terms regarding the sale of goods are not controlling if the terms do not reflect what would objectively be reasonable from the viewpoint of a third party–that is, from the viewpoint of a stranger to the transaction. Because the retention of title by a seller to goods would not provide third parties with objectively recognizable notice, a seller is limited to the reservation of a security interest under U.C.C. § 2-401.

Although generally parties may contract around the default rules provided by U.C.C. § 2-401, subsection 1 limits such agreements.  In re Aleris Int'l., Inc., 456 B.R. 35, 41 (Bankr. D. Del. 2011).  N.C. Gen. Stat. § 25-2-401 provides that where matters regarding title to goods become material in situations not covered by other Article 2 provisions,

> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (G.S. 25-2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this chapter.  Any retention or reservation by the seller of the title (property) in goods shipped or

delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading

> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
> (b) if the contract requires delivery at destination, title passes on tender there.

N.C. Gen. Stat. § 25-2-401.  U.C.C. § 2-401(1) prohibits the retention or reservation of title by a seller, and deems it to be only a reservation of a security interest in goods.  In re Aleris Int'l., Inc., 456. B.R. at 41.  U.C.C. § 2-401 explicitly provides that any agreement between parties as to passage of title is subject to its provisions and the provisions of Article 9.  N.C. Gen. Stat. § 25-2-401(1); Schroeder, supra, at 1321 (noting that the rules of Article 2 apply even if the contracting parties subjectively intend for title to pass at another time).

Even if the parties agreed by contract that title to the goods remains with the seller and the buyer had no interest in owning the goods, the most that a seller can retain in the delivered goods is a security interest.  See Nanak Resorts, Inc. v. Haskins Gas Serv., Inc. (In re Rome Family Corp.), 407 B.R. 65, 75 (Bankr. D. Vt. 2009) ("[U]pon delivery of the goods, title shifts to the buyer, by operation of law, under 9A V.S.A. § 2–401(1) even when the parties have explicitly agreed that title will remain in the seller post-delivery.").  One court, examining the provisions of Section 2-401, explained:

> Because § 2-401(1) deals with express agreements regarding passage of title as a general rule, § 2-401(2) and § 2-401(3) can only be viewed as dealing with certain common fact patterns in which the parties did not make express agreement regarding passage of title, and where, for example, the goods are being shipped,

the goods are in storage or are at their usual place of repose, or where (as here) the goods are already in possession of the buyer. The "Unless" clauses which introduce them demonstrate the drafters' intent that § 2-401(2) and (3) are "default" rules -- rules that apply in the absence of contrary agreement. But any contrary agreement cannot conflict with § 2-401(1). The "Unless . . ." clauses are to be read as if they said: "In the absence of <u>such</u> an agreement which explicitly provides to the contrary . . .," in which event the "such" would refer to agreements contemplated by § 2-401(1), including its limitations. This writer has tinkered with the language and is convinced that there is no logical construction of § 2-401(2) or § 2-401(3) that would permit disobedience to § 2-401(1). Section 2-401(1) deals with agreements. Sections 2-401(2) and (3) deal with certain fact patterns in the absence of such an agreement.

In re J. Adrian Sons, Inc., 205 B.R. 24, 27 (Bankr. W.D.N.Y. 1997).  See also Stillwater Nat'l Bank & Trust Co. v. CIT Group/Equip. Fin. Inc., 383 F.3d 1148, 1152 (10th Cir. 2004) (holding that the retention of title pursuant to a repurchase agreement limits the seller to the reservation of a security interest under U.C.C. § 2-401); In re Samuels & Co., 526 F.2d 1238, 1246 (5th Cir.), cert. denied, 429 U.S. 834 (1976) (U.C.C. § 2-401 "specifically limits the seller's ability to reserve title once he has voluntarily surrendered possession to the buyer");  Renshaw v. Hancock (In re Renshaw), 421 B.R. 738 (Bankr. M.D.N.C. 2009) (affirming bankruptcy court's conclusion that the seller was limited to a security interest in a sewing machine delivered to the debtor even though the agreement between the parties was labeled a "layaway agreement"); Conn. Bank & Trust Co. v. Schindelman (In re Bosson), 432 F. Supp. 1013, 1021 (D. Conn. 1977) (stating that contractual language providing that title remains with seller until all car payments are made merely creates a security interest); Rome Family, 407 B.R. at 75 ("[P]ursuant to § 2-401, title passes to the buyer upon delivery of the goods, and the seller's interest is limited to a reservation of a security interest, notwithstanding any contractual agreement between the parties that the seller will retain title."); Payne, 2006 WL 3524442, at * 1 (limiting the seller's interest in the car to a security interest even though the seller's name appeared on the vehicle's certificate of title); Riddle Farm, 2004 WL 3510119, at *2 (holding that even if an agreement

that title would pass once financing was obtained, the most a creditor could claim was a security interest once the good was deivered); Pro Page Partners, LLC v. Message Express Paging Co. (In re Pro Page Partners, LLC), 270 B.R. 221, 233-34 (Bankr. E.D. Tenn. 2001) (finding that a purported management agreement was a disguised financing arrangement, and holding that the reservation of title in goods possessed by the debtor was limited in effect to the reservation of a security interest under U.C.C. § 2-401); McCarthy v. Imported Cars of Md., Inc. (In re Johnson), 230 B.R. 466, 468 (Bankr. D.D.C. 1999) ("The passage of title cannot . . . be delayed until after shipment or delivery of the goods to the buyer. After shipment or delivery, any retention of title by the seller results only in the reservation of a security interest."); Associated Indus. v. Keystone Gen., Inc., 135 B.R. 275, 279 (Bankr. S.D. Ohio 1991) ("While the Uniform Commercial Code does permit the parties some power by allowing the parties to agree as to when title will transfer, the Code and the caselaw place a limitation on this power. In short, if the seller attempts to retain title after delivery or until paid in full, all the seller gets is a security interest."); In re Phillips, 77 B.R. 648, 650 (Bankr. E.D. Tenn. 1987) (holding that after delivery under a sale agreement, even if the parties intended "that title would not pass until the other documents were completed and signed . . .[,] retention of title would only have given [the creditor] a security interest"); Seitz v Stecklein, 111 Idaho 364, 723 P2d 908 (Idaho App. 1986) (holding that, with respect to owner's summary-judgment claims against subsequent buyers, under U.C.C. § 2-401(1), owner's reservation of title in himself was limited in effect to reservation of security interest and that failure of owner to perfect his security interest made it subordinate under UCC § 9-301(1)(c) to rights of "buyer not in ordinary course of business"); O'Dell v. Kunkels's, Inc., 581 P.2d 878, 881 (Okla. 1978) ("Devices whereby title is reserved in the seller-creditor for a period of time following possession by the debtor are treated under

Article 9 of the U.C.C. as though title had been transferred to the debtor and the seller-creditor had retained only a security interest in the goods.").

### 3. The Application of N.C. Gen. Stat. § 25-2-401(1)

Since N.C. Gen. Stat. § 25-2-401 applies to this case, the Court must determine at what point the corn was actually delivered.[6]  While both parties agree that the contractual language in Section 7 of the Feedstock Supply Agreement is clear and unambiguous, the parties have different interpretations of the contractual language.

The U.C.C. does not define the term "delivery" for all types of goods, <u>see</u> N.C. Gen. Stat. § 25-1-201(15), but it does provide the place at which delivery occurs in the absence of an agreed-upon term stated in the contract.  <u>See</u> N.C. Gen. Stat. § 25-2-308(a).  Where a contract of sale specifies delivery terms, the "delivery" is not accomplished until those terms are satisfied. <u>Performance Motors v. Allen</u>, 280 N.C. 385, 395, 186 S.E.2d 161, 167 (1972) (defining delivery in the context of a sale under the U.C.C.).  Section 7 of the Feedstock Supply Agreement states "The [corn] will be delivered to the Ethanol Facility FOB.  Delivery is complete once Perdue delivers the [corn] to [the Debtor's] site."  (Pl.'s Br. Ex. E at § 7).

The Feedstock Supply Agreement provides that "Perdue shall retain ownership of the [corn] until the [corn] leaves the storage bin and moves across the weighbelt into the plant at the Ethanol Facility."  (Pl.'s Br. Ex. E at §§ 2(C), 7).  The Feedstock Supply Agreement requires the Debtor to "execute and deliver . . . such agreements, instruments, certificates, documents or undertakings, and/or to take any actions, as shall be necessary or appropriate to secure or

---

[6]"It could not be any clearer to this Court that the ability to expressly agree on when title passes to the buyer is subject to the second sentence of § 2-401(1). The limiting operation of reservation of title found in the second sentence of § 2-401(1) is triggered by delivery. <u>Delivery of the goods is the key.</u> It is only when the seller has delivered the goods to the buyer that a seller's express reservation of title is limited to retention of a security interest. If there has been no delivery, the express reservation of title may be enforced."  <u>In re Wild W. World, LLC</u>, 2008 WL 4642266, slip op. at 4 (Bankr. D. Kan. Oct. 17, 2008) (emphasis added).

otherwise evidence Perdue's ownership of its inventory at the Ethanol Facility." (Pl.'s Br. Ex. E at, § 2(c)). Thus, the parties clearly intended for Perdue to own the Corn until it passed over the weighbelt.

Because section 7 of the Feedstock Supply Agreement explicitly provides that delivery is complete, at the latest, when the corn is received at the Debtor's facility, the Corn was delivered within the meaning of N.C. Gen. Stat. § 25-2-308(a) before it reached the leased bins.[7] As a result, despite the parties' intent for title to pass when the corn crosses the weighbelt, N.C. Gen. Stat. § 25-2-401(1) limits Perdue's reservation of title in the Corn to a reservation of a security interest.[8] Accordingly, the Corn is property of the Debtor's estate. See 11 U.S.C. § 541.

### 4. Perdue Did Not Perfect Its Security Interest

The U.C.C. defines a secured party as "a person that holds a security interest arising under G.S. 25-2-401." N.C. Gen. Stat. § 25-9-102(75)(f). As U.C.C.§ 2-401 limits Perdue's intended ownership of the Corn to the reservation of a security interest, Perdue is a secured party and must have perfected its security interest to retain its rights in the Corn.[9] The purpose of the

---

[7] The parties also agreed that the corn shipped by rail was delivered F.O.B., which fixes delivery at the time that the corn was placed in the rail cars for shipment. See N.C. Gen. Stat § 25-2-319(1). However, because all corn was delivered pursuant to the terms of section 7 of the Feedstock Supply Agreement before it was placed in the bins at the Debtor's facility, the Court need not analyze this provision.

[8] As N.C. Gen. Stat § 25-2-401 is determinative as to whether the Corn is property of the estate, the Court need not address the Debtor's alternate argument that the transaction constitutes a consignment.

[9] A "seller's security interest is unperfected unless the seller has complied with the provisions of Article 9 on perfection." William D. Hawkland, 2 Hawkland UCC Series § 2-401:3 (Frederick H. Miller ed. 2012) (footnotes omitted). As noted by the Fifth Circuit Court of Appeals, this result is not unfair:

> Any seeming unfairness to [sellers] resulting from the Code's operation is illusory, for the sellers could have protected their interests, even as against [a third party's] prior perfected interest, if they had merely complied with the U.C.C.'s purchase-money provisions. The Code favors purchase-money financing, and encourages it by granting to a seller of goods the power to defeat prior liens. The seller at most need only (1) file a financing statement and (2) notify the prior secured party of its interest before delivery of the new inventory. The procedure is

traditional perfection-by-filing requirement is to give third parties notice of the secured party's interest in the collateral.  1A-6A Julian B. McDonnell et al., Secured Transactions Under the UCC § 6A.03 (Matthew Bender & Co., Inc. 2013); Hutchison v. C.I.T. Corp., 726 F.2d 300, 302 (6th Cir. 1984) (explaining that "[t]he U.C.C. permits perfection by possession because possession can give notice to third-parties that the creditor has an interest in the collateral."). Although security interests are generally perfected by filing, the U.C.C. allows a creditor to perfect its security interest by taking possession of the goods, providing, in relevant part:

> (a) Except as otherwise provided in subsection (b) of this section, a secured party may perfect a security interest in tangible negotiable documents, goods, instruments, money, or tangible chattel paper by taking possession of the collateral
> …
> (d) Time of perfection by possession; continuation of perfection. If perfection of a security interest depends upon possession of the collateral by a secured party, perfection occurs no earlier than the time the secured party takes possession and continues only while the secured party retains possession.

N.C. Gen. Stat. § 25-9-313(a), (d).

Although Perdue did not perfect its security interest by filing, the question remains whether Perdue perfected its interest by possession. The U.C.C. does not define possession, but it adopts the general concept as it developed under former Article 9.  N.C. Gen. Stat. § 25-9-313, Cmt. 3 (noting that the principles of agency apply); 4 White & Summers, Uniform Commercial Code § 31-8 (6th ed. 2012) ("We are left, therefore, with several hundred years of cases and with the policy of Article 9 to help us define the word possession.").  The main focus of possession is

---

not unduly complex or cumbersome. But whether cumbersome or not, a [seller] who chooses to ignore its provisions takes a calculated risk that a loss will result. In the instant case [the sellers] did not utilize § 9.312's purchase-money provision. The sellers never perfected. Thus, in a competition with a perfected secured party they are subordinated, and in this case, lose the whole of their interests.
Stowers v. Mahon (In re Samuels & Co.), 526 F.2d 1238, 1247-48 (5th Cir. 1976), cert. denied, 429 U.S. 834 (1976)  (citations omitted).

whether the evidentiary and notice functions are satisfied.  Secured Transactions Under the UCC § 6A.03[1][c][ii].

Black's Law Dictionary defines possession as "[t]he fact of having or holding property in one's power; the exercise of dominion over property; and 2. [t]he right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object."  Black's Law Dictionary 546 (3d Pocket ed. 2006). Consistent with this definition, the Fourth Circuit has held, "The ostensible ownership exercised through possession is demonstrated through simple physical control. One who controls the collateral possesses it, and leads others to believe it is his."  In re Automated Book-Binding Servs., Inc., 471 F.2d 546, 552 (4th Cir. 1972) (holding that possession was obtained when goods were received at the debtor's facility and was not dependent on the contractual terms between the parties). Because notice is a heightened requirement, courts have stated that for perfection by possession to occur, "possession must be 'unequivocal, absolute and notorious, so that third parties may be advised.'"  Hutchison, 726 F.2d at 302 (quoting Transp. Equip. Co. v. Guar. State Bank, 518 F.2d 377, 381 (10th Cir. 1975)).

Because there is no clear definition of possession, possession may be achieved in various ways.  For instance, a secured party may perfect by actual possession, such as where the collateral is placed in the secured party's hands through physical delivery to it or its agent, or another kind of notorious physical control.  Secured Transactions Under the UCC at § 6A.03[1]. Alternatively, a secured party may establish possession where it controls the premises where the collateral is located.  See In re Childress, 1969 WL 11001 (Bankr. E.D. Tenn. May 1, 1969) (holding that the secured party obtained possession to collateralized furniture and equipment within a restaurant when the debtor handed the restaurant keys to the secured party and left the premises); Rosner v. Plaza Hotel Assoc., Inc., 146 N.J. Super. 447, 453-54, 370 A.2d 41, 45

(N.J. App. Div. 1977) (finding that the secured party had possession of the hotel's personalty when the debtor handed the hotel's keys to the secured party).

The Fourth Circuit has held that a "pledgee must either have actual exclusive possession of the property, or if it remains on the pledgor's premises he must so separate and mark it as to give notice of his possession to the public." In re Spanish-American Cork Prods. Co., 2 F.2d 203, 204 (4th Cir. 1924) (holding that signs placed on the inside of a leased space were not alone sufficient to provide notice of control of any part of the premises by anyone other than the debtor). The Fourth Circuit has further held that it is the duty of the secured party to segregate and possess the collateral so that the secured party's interest will indicate its possession of the collateral to "business men of ordinary prudence dealing with the debtor in the ordinary course of business." Id. at 204. The mere intention or right to take possession of the collateral by the secured party alone is not sufficient to constitute possession. Secured Transactions Under the UCC at § 6A.03[1][a]. In sum, possession requires the secured party to have some form of dominion or control over the collateral, and the control must be such that third parties would be put on notice of the secured party's interest in that collateral.

Under the Lease, Perdue had the right to cut power to the load-out equipment on the storage bins to prevent the Debtor or anyone else from obtaining access to the Corn. (Pl.'s Br. Ex. H, at § 1.3.) But the Debtor never requested permission from Perdue to remove the corn from the bins, nor was the Debtor prohibited from removing corn as it produced ethanol. (Pl.'s Br. Exs. J, M, Def.'s Br. Ex. 44.) The Feedstock Supply Agreement obligated the Debtor "to place notices on the Bins or otherwise display notice at the Ethanol Facility in such a manner that is reasonably sufficient to notify third-parties that the Bins have been designated exclusively to receive and store [corn] owned by [Perdue], and that any [corn] stored in such Bins are the property of [Perdue] and not of [the Debtor]." (Pl.'s Br. Ex. H, at § 1.3.) However, no signs

were placed on the storage bins or anywhere else at the plant indicating that Perdue had an interest in the Corn.  (Pl.'s Br. Ex. J at  ¶ 42). Of greater significance is that Perdue's alleged control over the Corn did not provide any notice to third parties.

Assuming that Perdue had control over the Corn simply by its ability to prevent the Debtor from accessing it, such control, alone, does not provide notice to third parties of ordinary prudence dealing with the Debtor in the ordinary course of business.  Such third parties could not be privy to the Agreements and would not have had notice of Perdue's security interest in the Corn.  Accordingly, Perdue's reservation of a security interest in the Corn is not perfected by possession under N.C. Gen. Stat. § 25-9-313.

### 5.  Perdue Cannot Benefit from Cape Fear's Security Interest

At oral argument, Perdue asserted that third parties had notice of a security interest in the Corn, despite Perdue's failure to perfect its security interest, because Cape Fear perfected a security interest in all of the Debtor's assets, including the Corn.  It is true that Cape Fear has a security interest, which was perfected by filing a financing statement.  Perdue argues that third parties are on notice that the Corn was encumbered–at least to some degree–due to Cape Fear's perfected security interest.

The perfection of one creditor's security interest in collateral provides notice to third parties of only the interest of the creditor that actually perfected, not of any other security interests in the collateral.  Debtors often pledge the same assets as collateral to several creditors. 4 White & Summers, Uniform Commercial Code § 23-4 (6th ed. 2012).  The public notification requirements limit a debtor's ability to borrow multiple times against the same collateral.  Id. The U.C.C. permits third parties to rely on the record to determine whether a perfected security interest exists.  It also allows third parties to rely on the debtor's circumstances to determine whether another party has possession of the assets that the debtor proposed as collateral.

27

However, Cape Fear's filed financing statement provides no notice of Perdue's interest by either method.[10]   A third party with knowledge of Cape Fear's security interest has no notice of Perdue's security interest, and therein lies the problem for Perdue.

Perdue also argues that Cape Fear subordinated its perfected security interest in the Corn to Perdue.  It is true that Cape Fear entered into the Subordination Agreement, which subordinated Perdue's rights under the Lease to Cape Fear's lien and provided that Perdue retains ownership of the corn prior to its passage over the weightbelt. (Def.'s Br Ex. 35 at § 1.) It is also true that a secured party with priority is permitted to subordinate its claim by agreement.  N.C. Gen. Stat. § 25-9-339.  However, the Subordination Agreement does not place Perdue in the shoes of Cape Fear.[11]   The rights of Cape Fear as a secured creditor do not pass to Perdue, either through the Subordination Agreement or any other way.[12] Cape Fear and Perdue agreed that the Corn belonged to Perdue before it crossed over the weightbelt, but the

---

[10]Neither does the Subordination Agreement provide third parties notice of Perdue's security interest in the Corn.  The Subordination Agreement, filed with the Hoke County Register of Deeds, does not provide such notice because third parties would search for evidence of a security interest in the Office of the North Carolina Secretary of State.  Moreover, Cape Fear's financing statement does not mention any subordination agreements.

[11]Perdue may have intended to argue that its rights were subrogated to the rights of Cape Fear. Subrogation permits a party who has satisfied the obligation of another party to pursue the rights of the party whose obligation was satisfied.  US Airways, Inc. V. McCutchen, 133 S.Ct. 1537, 1546 n. 5 (2013) ("'Subrogation simply means substitution of one person for another; that is one person is allowed to stand in the shoes of another and assert that person's rights against' a third party.").  Perdue did not satisfy an obligation of Cape Fear and is not entitled to assert any of Cape Fear's rights.  Thus, Perdue cannot be subrogated to Cape Fear's perfected security interest in the Corn.

[12]Neither were Cape Fear's rights assigned to Perdue.  A secured party may assign its perfected security interest to a third party. Upon assignment, no filing is required in order to continue the perfected status of the security interest against creditors of and transferees from the original debtor.  N.C. Gen. Stat. § 25-9-310(c).  But the Subordination Agreement does not constitute an assignment of Cape Fear's security interest to Perdue. Rather, Cape Fear simply subordinated its perfected security interest to Perdue's unperfected security interest.  In terms of priority, Perdue's security interest in the Corn has priority over Cape Fear, but not over any other creditors, and certainly not over the Trustee, who is clothed with the powers of a hypothetical lien creditor.  11 U.S.C. § 544(a).

Subordination Agreement is not binding on other parties, especially parties who have no knowledge of it.

### 6. The Corn Was Not Delivered to Perdue

At oral argument, Perdue also asserted that it intended to deliver the Corn to itself. The Debtor and its employees, the argument goes, acted as agents of Perdue in accepting delivery of the Corn.

A principal may appoint an agent to act on the principal's behalf in the same capacity in which the principal can act on his own behalf. 2A C.J.S. Agency § 1. The agency relationship need not be express and, instead, may be implied from the words or conduct of the parties. Id. at § 43. An agency relationship exists only when the principal exercises a right of control over the agent, with the intent that the agent achieves the principal's purpose in dealings with third parties. Vares v. Vares, 154 N.C. App. 83, 87, 571 S.E.2d 612, 615 (2002), Julian v. Lawton, 240 N.C. 436, 440 82 S.E.2d 210, 213 (1954). Thus, the agent acts for the principal under the principal's actual or apparent grant of authority. 2A C.J.S. Agency § 1.

Actual agency requires the principal to exercise control over the agent and is characterized by the consent of the principal that the agent should act subject to his control. Bauer v. Douglas Aquatics, Inc., 207 N.C. App. 65, 77-78, 698 S.E.2d 757, 766-67 (2010); Colony Assocs. v. Fred L. Clapp & Co., 60 N.C. App. 634, 637-38, 300 S.E.2d 37, 40 (1983). The principal must have the right to control both the means and the process by which the agent is required to act. 24 N.C. Index Principal and Agent § 1 (4th ed.).

Apparent agency, on the other hand, requires words or conduct that reasonably cause a third party to believe that the principal has authorized an agent to act on the principal's behalf. Such words or conduct will be sufficient to create an agency relationship by implication. Id.

See also 2A C.J.S. Agency § 43.  The principal's nexus of control is relevant to whether or not an agency relationship has been implied. Id.

Under the Feedstock Supply Agreement, the Debtor is obligated to accept delivery of all corn, unless such corn is in noncompliance.  The terms of the Feedstock Supply Agreement are clear regarding delivery; it expressly provides that delivery is complete upon delivery to the Debtor's site, and requires the Debtor to accept all complying corn.  Additionally, throughout the contract, the Feedstock Supply Agreement states delivery will be made to the Debtor. There is no evidence that supports Perdue's assertion that the Debtor took delivery of the Corn on behalf of Perdue.  Furthermore, it is not reasonable for a third party to believe that a buyer was accepting delivery of goods on behalf of the seller of such goods.  In fact, a reasonable third party would logically assume just the opposite: the buyer accepted delivery of goods from the seller on his own behalf, and the seller relinquished his rights to such goods.  There is simply no support in the record for Perdue's assertion that it delivered the Corn to itself.

**7.  Conclusion**

The Court finds that upon the application of N.C. Gen. Stat. § 25-2-401, the Corn is property of the estate, Perdue holds an unperfected security interest in the Corn and its proceeds, and the Trustee may avoid Perdue's unperfected security interest pursuant to Section 544(a).[13] Accordingly, the Trustee Motion is granted as to Counts 1, 2, 5, and 6, and the Perdue Motion is denied as to those same counts.

---

[13]As the application of the U.C.C. to the facts of this case does not involve the Lease, and the Trustee concedes that avoidance of the Lease does not affect a determination of the Debtor's interest in the Corn, the Court need not decide Count 4 of the complaint involving whether the Lease should be avoided.

**C. Perdue's Right to Set Off**

Section 553 of the Bankruptcy Code governs the right to setoff by preserving any setoff right provided under non-bankruptcy law rather than creating one. Citizens Bank of Md. v. Strumpf, 516 U.S. 16, 18 (1995). The creditor bears the burden of proving a right to setoff by showing that (1) the debtor owes a prepetition debt to the creditor, (2) the creditor owes a prepetition debt to the debtor, and (3) the debts are mutual. 11 U.S.C. § 553. However, the allowance of a setoff right is completely within the bankruptcy court's discretion. In re Larbar Corp, 177 F.3d 439, 447 (6th Cir. 1999) (citing Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1165 (2d Cir. 1979))

In 1978, Section 553(a)(3) was added to the Bankruptcy Code "to close a loophole that had allowed preferences in the form of set offs." In re Elcona Homes Corp., 863 F.2d 483, 486 (7th Cir. 1988). Section 553(a)(3) modified a Bankruptcy Act provision that prohibited setting off debt intentionally incurred for such a purpose by effectively limiting the determinative inquiry to whether the creditor intended to offset the recently acquired debt. In re Butcher, 79 B.R. 741, 746 (Bankr. E.D. Tenn. 1987) (quoting DuVoisin v. Foster (In re S. Indus. Banking Corp.), 48 B.R. 306, 309 (Bankr. E.D. Tenn. 1985)). The Section 553(a)(3) exception to setoff "prevents the courts from rewarding creditors who persuade a debtor to engage in conduct which has the effect of impermissibly improving the creditor's position among the other creditors." Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.), 940 F.2d. 1507, 1513 (11th Cir. 1991) ("the archetypal situation is the case where a debtor has a preexisting obligation to the creditor, and, in the months prior to debtor's filing for bankruptcy, the debtor pays back the creditor by 'loaning' him money. Later the parties notice the two debts and engage in setoff, canceling both of them. In this archetypal situation, the creditor obtains the debt only to engage

in setoff, thus this 'loan' is disfavored by the setoff rules"); <u>In re United Scis. of Am., Inc.</u>, 893 F.2d 720, 725 (5th Cir. 1990) (Section 553(a)(3) "is designed to prevent a bank from undertaking a build-up of the debtor's account in order to secure a preference,"); <u>DuVoisin v. Foster (In re S. Indus. Banking Corp.)</u>, 809 F.2d 329 (6th Cir. 1987) (holding that a creditor could not set off a debt owed on a loan that he took out a month before the bankruptcy against the value he paid for investment certificates from the debtor-bank a year earlier in order to improve his position as a creditor based on the timing of the loan).

"For purposes of § 553(a)(3), the debt that the creditor owes to the debtor must be incurred for the specific purpose of achieving setoff rights." <u>In re Summit Fin. Servs., Inc.</u>, 240 B.R. 105, 120 (Bankr. N.D. Ga. 1999) (citing <u>Official Comm. of Unsecured Creditors v. Mfr. & Traders Trust Co. (In re The Bennett Funding Grp., Inc.)</u>, 146 F.3d 136, 140 (2d Cir. 1998)). The debtor has the burden of proving that a creditor obtained a claim for the purpose of obtaining setoff rights. <u>In re Energy Co-op., Inc.</u>, 100 B.R. 992, 995 (N.D. Ill. 1989) (citing <u>Record Club of Am. v. United Artists Records</u>, 80 B.R. 271 (S.D.N.Y. 1987)). "There must be facts to show an intent to manipulate the balance in order to create an issue of fact." <u>Energy Co-op</u>, 100 B.R. at 995. <u>See</u> <u>In re Dillard Ford, Inc.</u>, 940 F.2d. 1507, 1513 (11th Cir. 1991) (holding that a creditor did not incur debt for the purpose of set off where it stopped payment to the debtor). <u>But see</u> <u>In re Bohlen Enter., Ltd.</u>, 859 F.2d 561, 568 (8th Cir. 1988) (holding that the debtor's deposit of funds was not in the ordinary course of business and was for the purpose of creating a setoff right for the bank).

Factors that courts consider when evaluating whether debt was acquired for the purpose of obtaining a right to setoff include whether the debt was incurred in good faith and in the regular course of business. <u>In re Kroh Bros. Dev. Co.</u>, 86 B.R. 186, 191 (Bankr. W.D. Mo. 1988) (listing factors considered in determining whether a bank accepted a deposit for the

purpose of obtaining a setoff right); In re Union Cartage Co., 38 B.R. 134, 139 (Bankr. D. Ohio 1984) (same).  Thus, where a setoff right arises from transactions in the ordinary course of business, courts have held that the setoff right is not prohibited by Section 553(a)(3).  See United Scis., 893 F.2d at 725 (affirming lower court's holding that acting in the ordinary course of business to protect its rights was not an intent to obtain a setoff right).  Similarly, where a debtor's entitlement to funds from a creditor arise by legal operation, courts have found that an intent to obtain a right to setoff is not present.  In re Ogle, 2011 WL 666359, at *4 (Bankr. D.S.D. Feb. 14, 2011).

Here, Perdue was under a contractual obligation, incurred years prior to the bankruptcy, to accept and purchase all of the DDGS that the Debtor produced. (Pl.'s Br. Ex. L, Ex. J.) Similar to a right that arises by operation of law, Perdue's obligation to incur the debt was a contractual mandate rather than an option.  The Trustee submitted a series of e-mails, arguing that an inference should be drawn from them that Perdue's decision to stop payment for the DDGS was for the purpose of obtaining a right to setoff.  (Pl.'s Resp. Br. Exs. FF, HH, II.)  One e-mail, dated February 28, 2011, indicates that Perdue decided to stop shipping corn to the Debtor and cease payments to the Debtor for the DDGS. Although the e-mails do not specifically indicate an intent to offset the payments owed on the DDGS against the amounts owed for the Corn, it is possible to draw that inference.  However, in a response to one of the Debtor's interrogatories, Perdue states

> Subsequent payments were not made to [the Debtor] because [the Debtor's] plant had ceased operating and a sizeable amount was owed to [Perdue] by [the Debtor] for Feedstock that had been delivered . . . but had not been paid for. Amounts payable to [the Debtor] for DDGS taken by [Perdue] following the final cash payment form the basis for a set-off against the amounts owed by [the Debtor] to [Perdue] for Feedstock.

Collectively, the e-mails and the interrogatory response suggest a possible intent to build up Perdue's existing setoff right. Therefore, as to Count 7, there are material facts in controversy, and the Perdue Motion must be denied.

### V. CONCLUSION

N.C. Gen. Stat § 2-401 applies to the transactions between Perdue and the Debtor. Perdue is therefore limited to an unperfected security interest in the Corn, which the Trustee may avoid. Additionally, the series of e-mails submitted by the Trustee, considered in light of Perdue's interrogatory response, suggest a possible intent to build up its setoff right, creating a genuine dispute of material fact. Accordingly, for the reasons stated, the Trustee Motion will be granted as to Counts 1, 2, 5, and 6 of the complaint. As to Counts 1, 2, 5, 6, and 7, the Perdue Motion will be denied.

This opinion constitutes the Court's findings of fact and conclusions of law. The Court will issue a separate order.

END OF DOCUMENT