**SO ORDERED.**

**SIGNED this 28th day of June, 2013.**





THOMAS W. WALDREP, JR.
UNITED STATES BANKRUPTCY JUDGE

---

**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**
**DURHAM DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| CLEAN BURN FUELS, LLC, | ) | Case No. 11-80562 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| CLEAN BURN FUELS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Pro. No. 11-09046 |
| | ) | |
| v. | ) | |
| | ) | |
| PURDUE BIOENERGY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**

Before the Court is a claim for breach of contract asserted by Clean Burn Fuels, LLC (the

"Debtor") in the Amended Complaint filed on July 20, 2011. In November of 2009, the Debtor

and Perdue BioEnergy, LLC ("Perdue") entered into a series of agreements regarding the supply

and delivery of corn and the purchase of a by-product resulting from the production of ethanol.

The breach of contract claim set forth in the Amended Complaint asserted that, pursuant to

1

Section 553(a)(3) of the Bankruptcy Code, Perdue had no right to set off a portion of its claim because that portion was based on a debt incurred with the intent to increase the setoff right. Upon consideration of the pleadings, and the evidence presented at the trial held on June 21, 2013, and for the following reasons, the Court finds that Perdue did not breach the contract and has a valid right to setoff.

## I.  FACTS

The Debtor owned and operated a plant in Raeford, North Carolina, designed to produce and sell ethanol. The plant purported to produce up to 60,000,000 gallons of ethanol per year, requiring 22 million bushels of corn annually, or 1.8 million bushels per month. On November 2, 2009, the Debtor and Perdue entered into several agreements regarding the sourcing of corn and the disposition of certain by-products, consisting of the Feedstock Agreement, the Co-Products Agreement, and the Master Agreement (collectively, the "Agreements"). The Feedstock Supply Agreement obligated the Debtor to buy corn exclusively from Perdue and required Perdue to sell and deliver all of the corn required by the Debtor for ethanol production.

As a by-product of processing corn into ethanol, the Debtor also produced dried distillers grains with solubles ("DDGS"), which are made from the ground corn and used by farmers as livestock feed.  The Co-Products Agreement governed the Debtor's sale of DDGS, providing that Perdue would purchase all DDGS produced by the Debtor. Additionally, Perdue would enter into contracts with third parties for the resale of the purchased DDGS. Perdue's ability to arrange such resale was contingent upon an agreement between Perdue and the Debtor on the resale price of the DDGS. (Ex. B § 1.1.) With regard to the third party sales, the Co-Products Agreement placed responsibility on the Debtor "for any contracts previously approved by [the Debtor] that Perdue may have made on their behalf." (Ex. B § 1.3.) It further obligated Perdue to "use its best

2

efforts to buy product from outside suppliers to cover these contracts at the contractual price, but any price differential or reasonably anticipated additional cost will be for [the Debtor's] account." (Ex. B § 1.3.)

Following the initial production of DDGS, the Co-Products Agreement required the Debtor to notify Perdue of its scheduled production for the upcoming three-month period on the first business day of each month. (Ex. B §§ 4.4, 6.1.) It further obligated the Debtor to provide a weekly written estimate regarding the volume of DDGS to be produced and delivered as well as a notice stating the amount of DDGS in inventory as of the notice date. (Ex. B § 4.4.) Similarly, the Feedstock Supply Agreement obligated the Debtor to provide Perdue a monthly estimate for the corn required for the upcoming three-month period. (Ex. 4 § 3(a).) In the event that the Debtor anticipated a disruption or reduction in production of DDGS, the Co-Products Agreement required the Debtor to notify Perdue at least three months in advance. (Ex. B § 6.1.) The Co-Products Agreement was to be governed by the current Feed Trade Rules of the national Grain and Feed Association (the "Trade Rules") and incorporated the terms of the Master Agreement. (Ex. B § 2.) Additionally, in the event of a default under the Co-Products Agreement, Perdue was entitled to exercise the remedies provided for in the Master Agreement. (Ex. B § 9.)

The Master Agreement, among other things, provided that "[n]otwithstanding anything to the contrary in any of the [Agreements] Perdue shall not be in default under this Master Agreement or any of the [Agreements] to the extent its failure to perform is the direct result of the breach by [the Debtor] of any term or covenant contained in this Master Agreement or any of the [Agreements]." (Ex. A § 6(b).) It also obligated the Debtor to "indemnify, defend and hold harmless Perdue… from any and against any and all Damages to the extent arising out of … (ii)

3

any material breach of this Master Agreement or any of the [Agreements] by [the Debtor]… ."
(Ex. A § 9(a).)

Between June 2010 and early 2011, the price of corn more than doubled, while the price of ethanol did not increase in similar proportions. In late 2010, due to the high cost of corn compared to the market value of ethanol and additional construction costs, the Debtor began to lose money, and the Debtor began communicating its financial problems to Perdue. As a result of its financial difficulties, on February 25, 2011, the Debtor defaulted under the Feedstock Supply Agreement because it paid Perdue less than half of the amount owed for corn used by the Debtor that week. On February 27, 2011, the Debtor's board of directors convened to discuss the Debtor's financial situation and, based on the inability to make up the deficient payment, recommended that the Debtor cease its purchase of corn from Perdue.  On February 28, 2011, the Debtor stopped purchasing corn but did not cease the sale of ethanol or DDGS.

On the morning of February 28, 2011, Kirk Bradley, Chairman of the Debtor's board, spoke with Tom Mahn, a Perdue employee, and informed him that the Debtor would no longer be able to afford to purchase corn from Perdue and discussed the best way to cease the transfer of corn. On February 28, 2011 at 9:01 a.m., Mahn sent an internal e-mail to certain other Perdue employees, informing them of his conversation with Bradley. (Ex. N.) The e-mail explained that, according to Bradley, the Debtor would not be able to purchase any more corn from Perdue based on the Debtor's financial condition and had requested that Perdue cease the transfer of corn. (Ex. N.) The e-mail also indicated that two Perdue employees had been notified during the previous week that the Debtor intended to scale back its operations and requested that Perdue redirect shipments of corn. (Ex. N.) The e-mail concluded by recommending the cessation of any further transfers of corn or any payments for DDGS until resolution of the matter. (Ex. N.) Gary

4

Cordier, a Perdue employee, replied to the e-mail, indicating that he directed that all DDGS payments stop immediately and that they could "turn on when we see fit." (Ex. N.) At 4:28 p.m., Michael Donnelly, another Perdue employee, sent a response confirming the agreement to cease the transfer of the corn and stating that Bradley understood that the plant would shut down. (Ex. O.)

On February 28, 2011 at 9:39 p.m., Mahn sent an e-mail to Bradley and other Perdue employees providing a statement of current invoices and the then current payment plan (Ex. P.) The e-mail further requested information regarding the partial payment for evaluation by Perdue's risk management team. (Ex. P.) At 9:48 pm, another Perdue employee, Al Lynch, sent an e-mail providing information regarding Perdue's exposure based on the payments owed by the Debtor for the purchase of corn and the amounts Perdue owed for the purchase of DDGS that would offset the Debtor's obligation. (Ex. Q.) The e-mail also stated that the Debtor would accumulate DDGS for Perdue's purchase and resale, which would reduce Perdue's exposure. (Ex. Q.)

At the time of these communications, the Debtor still held DDGS in its inventory as well as DDGS in the process of production. After February 28, 2011, the Debtor continued to ship DDGS, by transportation logistics arranged by Perdue, for delivery to third-party customers.  At a March 2, 2011 meeting, the Debtor's board of directors indicated their agreement that Perdue could ship and fill the outstanding third party contracts due to the contractual obligations imposed by the Agreements. (Ex. 20.) Based on the series of e-mails and conversations, the Debtor did not expect Perdue to make payments on the DDGS until the parties resolved the amount outstanding for the Debtor's purchase of corn. As the Debtor anticipated that the shutdown would only be temporary, it continued to allow Perdue to take DDGS because

Perdue's assistance was necessary if the Debtor was to restart its business. While Perdue paid all invoices due before February 28, 2011, Perdue made no further payments on the DDGS thereafter. In total, the Debtor made 757 shipments of DDGS to Perdue, and 431 of those shipments were not paid.

On March 8, 2011, the Debtor presented information to representatives of the Debtor's lender, Perdue, and other critical vendors regarding the Debtor's financial condition. (Ex. C.) The presentation addressed the anticipated temporary shutdown, proposals to the attendees regarding the concessions needed by the Debtor in order to restart its business, and the alternatives if a work-out agreement could not be reached. The presentation concluded by indicating that, based on limited liquidity and negative assets, without assistance the Debtor might need to file for bankruptcy protection. (Ex. C.)

On March 14, 2011 at 1:21 p.m., Mahn sent an e-mail to Bradley stating the amount that the Debtor owed to Perdue, which was calculated by reducing the amount the Debtor owed for corn by the amount Perdue owed for DDGS. (Ex. V.) The e-mail further suggested a payment plan for the Debtor that would reduce Perdue's exposure while allowing the Debtor the opportunity to restructure. (Ex. V.)

The Debtor's efforts to resume production at the plant were unsuccessful. On April 3, 2011, the Debtor filed a petition seeking relief under Chapter 11 of the Bankruptcy Code. On May 2, 2011, the Debtor initiated this adversary proceeding. On July 20, 2011, the trustee for the Debtor[1] (the "Trustee") filed an Amended Complaint asserting seven claims for relief, many of

---

[1] When this adversary proceeding was originally filed, the case was being administered under Chapter 11, with the Debtor as a debtor-in-possession. The Court appointed a Chapter 11 trustee on January 10, 2012, who assumed all of the Debtor's arguments. On September 13, 2012, the case was converted to Chapter 7 and has been administered by the Chapter 7 trustee.

6

which related to corn that had been stored at the Debtor's facility.[2]  Count 7 asserted a claim for breach of contract due to Perdue's failure to pay for DDGS purchased by Perdue between February 28, 2011 and March 30, 2011.  As to Count 7, the Amended Complaint also asserted that Perdue has no right to set off because, during that period, Perdue incurred the debt for the purpose of obtaining a setoff right.

In its Amended Answer, Perdue asserted that the Debtor breached its obligations under the Co-Products Agreement. (Am. Answer at ¶ 68.) In Perdue's First Set of Discovery Responses, Perdue stated that

> [s]ubsequent payments were not made to [the Debtor] because the [Debtor's] plant had ceased operating and a sizable amount was owed to [Perdue] by [the Debtor] for Feedstock that had been delivered … but had not been paid for. Amounts payable to [the Debtor] for DDGS taken by [Perdue] following the final cash payment form the basis for a set-off against the amounts owed by [the Debtor] to [Perdue] for Feedstock. All of these rights arise under the Master agreement, Feedstock Agreement, and Co-Products Agreement, all of which were executed prior to the petition date on November 2, 2009.

(Ex. W at ¶18.)

Following extensive discovery, on January 24, 2013, both parties filed motions for partial summary judgment. On May 16, 2013, the Court entered a memorandum opinion and order granting partial summary judgment on Counts 1, 2, 4, 5 and 6 in favor of the Trustee, holding that, under N.C. Gen. Stat. § 25-2-401, Perdue's reservation of title to the corn was limited to a reservation of a security interest and that because Perdue did not perfect its security interest in the corn, the corn was property of the estate and the lien was avoidable. The Court denied

---

[2] Count 1 sought a declaratory judgment that the corn and its proceeds were property of the estate.  Count 2 sought a determination of Perdue's interest in the corn.  Count 3 sought a determination of Cape Fear's interest in the corn. Count 4 sought to avoid the Lease under Section 544(a).  Count 5 sought to avoid Perdue's unperfected security interest or lien on the corn pursuant to Section 544(a).  Count 6 sought to recover the corn because it was property of the estate.

summary judgment as to Count 7, finding that material facts were in genuine dispute with regard to Perdue's intent in increasing its setoff rights.

On June 21, 2013, the Court held a trial on the breach of contract claim. At the trial, the Trustee presented the testimony of Kirk Bradley and Ed Sanz, and extensive documentary evidence. At the close of the Trustee's evidence, Perdue moved for judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c).

## II.  JURISDICTION

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and Local Rule 83.11 of the United States District Court for the Middle District of North Carolina.  This is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B), and (O), which this Court has the jurisdiction to hear and determine. Pursuant to the analysis in Stern v. Marshall, 564 U.S. --, 131 S. Ct. 2594 (2011), the Court may enter a final order in this matter.

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 52(c) made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052, provides

> [i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. … A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

 Fed. R. Bankr. P. 7052(c).

Rule 52 requires the party with the burden of proof to offer sufficient evidence during its case in chief to warrant the presentation of a case by the opposing party. Gagliardi v. United States, 81 Fed. Cl. 772, 776 (Fed. Cl. 2008). Once a court has heard all of the plaintiff's

evidence, the court may appropriately determine whether the plaintiff has shown a right to relief.

Howard Indus., Inc. v. United States, 115 F. Supp. 481, 485-6 (Fed. Cl. 1953). In ruling on a

Rule 52(c) motion, the court "may not draw any special inferences in favor of the non-movant …

[i]nstead, the court must weigh the evidence, resolve any conflicts in it, and decide where the

preponderance lies." United States ex rel Ervin & Assocs. v. Hamilton Sec. Grp., Inc., 298 F.

Supp. 2d 91, 92-3 (D.D.C. 2004). In so doing, the court may draw reasonable inferences from

the facts presented. Id.

## IV.   LEGAL ANALYSIS

### A.   Breach of Contract

Although the parties' arguments focus on the existence of the right to setoff, it is

important to first evaluate the underlying breach of contract claim asserted in the Amended

Complaint. Under North Carolina law, a breach of contract claim requires showing "(1) [the]

existence of a valid contract and (2) breach of the terms of [the] contract." McLamb v. T.P. Inc.,

173 N.C. App. 586, 588, 619 S.E..2d 577, 580 (2005). Specifically, the plaintiff "must allege that

a valid contract existed between the parties, that [the] defendant breached the terms thereof, the

facts constituting the breach, and that damages resulted from such breach." Claggett v. Wake

Forest Univ., 126 N.C. App. 602, 608, 486 S.E.2d 443, 446 (1997).

The Debtor and Perdue entered into the Feedstock Supply Agreement, which is a

requirements contract, and the Co-Products Agreement, which is an output contract. The North

Carolina Uniform Commercial Code governs such output and requirements contracts and

provides:

> (1) A term which measures the quantity by the output of the seller or the
> requirements of the buyer means such actual output or requirements as may occur
> in good faith, except that no quantity unreasonably disproportionate to any stated

estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
(2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.

N.C. Gen. Stat. § 25-2-306.

A unique aspect of requirements and output contracts is that terms of such contracts relating to quantity are permitted to remain indefinite. See IWTMM, Inc. v. Forest Hills Rest Home, 156 N.C. App. 556, 577 S.E.2d 175 (2003) (noting that valid output and requirement contracts are recognized by law and by statute). Thus, the essential test for a breach of such contracts with regard to the quantities provided is whether the party acted in good faith. N.C. Gen. Stat. § 25-2-306 cmt.2. The "shutdown by a requirements buyer for lack of orders might be permissible when a shut-down merely to curtail losses would not." N.C. Gen. Stat. § 25-2-306 cmt. 3. Similarly, courts have held that a seller cannot simply cease production because the venture is no longer profitable and must still follow the cancellation procedures stated in the contract. Feld v. Henry S. Levy & Sons, Inc., 37 N.Y.2d 466, 335 N.E.2d 320 (1975).

A party to a contract who has been notified of a pending breach is granted certain remedies under the law. "The doctrine of anticipatory breach is well known: when a party to a contract gives notice that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise perform under the contract because of the anticipatory breach of the first party." Phoenix Ltd. P'ship of Raleigh v. Simpson, 201 N.C. App. 493, 505, 688 S.E.2d 717, 725 (2009). Additionally, anticipatory breach (or repudiation) and its corresponding remedies are provided in the North Carolina Uniform Commercial Code, which states

10

> [w]hen either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
>
> (a) for a commercially reasonable time await performance by the repudiating party; or
>
> (b) resort to any remedy for breach (G.S. 25-2-703 or G.S. 25-2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
>
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods.

N.C. Gen. Stat. § 25-2-610.

"[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." N.C. Gen. Stat. § 25-2-306 cmt. 1. Upon such communication, "the aggrieved party may at any time resort to his remedies for breach, or he may suspend his own performance while he negotiates with, or awaits performance by, the other party." N.C. Gen. Stat. § 25-2-306 cmt 1. See also N.C. Gen. Stat. § 25-2-610 cmt. 4 ("After repudiation, the aggrieved party may immediately resort to any remedy he chooses provided he moves in good faith."). "The test chosen to justify an aggrieved party's action … . is to determine whether material inconvenience or injustice will result if the aggrieved party is forced to wait and receive an ultimate tender minus the part or aspect repudiated." N.C. Gen. Stat. § 25-2-610 cmt. 3.

A breach may entitle the aggrieved party to incidental and consequential damages. N.C. Gen. Stat. § 25-2-713. "Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." N.C. Gen. Stat. § 25-2-715. "In the case of sale of wares to one in the business of reselling them, resale is one of the requirements of which the seller has reason to know within

11

the meaning of subsection (2)(a)." N.C. Gen. Stat. § 25-2-715 cmt. 6.  However, the Uniform

Commercial Code permits parties to limit damages by providing that

> (a) the agreement may provide for remedies in addition to or in substitution for those provided in this article and may limit or alter the measure of damages recoverable under this article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and
> (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

N.C. Gen. Stat. § 25-2-719. Thus, a seller may decline to accept the risk of consequential

damages by limiting such damages in a provision of the contract. N.C. Gen. Stat. § 25-2-715

cmt. 3;  N.C. Gen. Stat. § 25-2-719 cmt. 3. Additionally, a seller has a duty to minimize its loss

and mitigate damages resulting from a buyer's breach. Bombardier Capital, Inc. v. Lake Hickory

Watercraft, Inc., 178 N.C. App. 535, 632 S.E.2d. 192 (2006); Equitable Leasing Corp. v. Myers,

46 N.C. App. 162, 265 S.E.2d 240 (1980).

As a consequence of a right to damages, a buyer may notify the seller of an intention to

"deduct all or any part of the damages resulting from any breach of the contract from any part of

the price still due under the same contract." N.C. Gen. Stat § 25-2-717.  The Uniform

Commercial Code does not require formal notice of such intention, thus "any language which

reasonably indicates the buyer's reason for holding up his payment is sufficient." N.C. Gen. Stat.

§ 25-2-717 cmt. 2. See also Howie v. Rea, 70 N.C. 558 (1874) (holding that a buyer may deduct

damages where the contract was breached by the seller). "This section would not affect N.C.'s

law of set-off and counter claim as provided in 1-137." N.C. Gen. Stat. § 25-2-717 N.C. cmt.

B.  Setoff

Section 553 of the Bankruptcy Code governs the right to setoff by preserving such a right

under non-bankruptcy law rather than creating one. Citizens Bank of Md. v. Strumpf, 516 U.S.

(1995). The creditor bears the burden of proving a right to setoff by showing that (1) the debtor owes a prepetition debt to the creditor, (2) the creditor owes a prepetition debt to the debtor, and (3) the debts are mutual. 11 U.S.C. § 553. The right of setoff is completely within the bankruptcy court's discretion. In re Larbar Corp., 177 F.3d 339, 447 (6th Cir. 1999) (citing Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1165 (2d Cir. 1979)).

In 1978, Section 553(a)(3) was added to the Bankruptcy Code "to close a loophole that had allowed preferences in the form of set offs". In re Elcona Homes Corp., 863 F.2d 483, 486 (7th Cir. 1988). This exception to setoff "prevents the courts from regarding creditors who persuade a debtor to engage in conduct which has the effect of impermissibly improving the creditor's position among the other creditors. Woodrum v. Ford Motor Credit Co. (In re Dillard Ford, Inc.), 940 F.2d. 1507, 1513 (11th Cir. 1991) ("the archetypal situation is the case where a debtor has a preexisting obligation to the creditor, and, in the months prior to debtor's filing for bankruptcy, the debtor pays back the creditor by 'loaning' him money. … In this archetypal situation, the creditor obtains the debt only to engage in setoff, thus this 'loan' is disfavored by the setoff rules").

"For purposes of § 553(a)(3), the debt that the creditor owes to the debtor must be incurred for the specific purpose of achieving setoff rights." In re Summit Fin. Svcs., Inc., 240 B.R. 105, 120 (Bankr. N.D. Ga. 1999) (citing Official Comm. of Unsecured Creditors v. Mfr. & Traders Trust Co. (In re The Bennett Funding Grp., Inc.), 146 F.3d 136, 140 (2d Cir. 1998)). The debtor has the burden of proving that a creditor obtained a claim for the purpose of obtaining setoff rights. In re Energy Co-op., Inc., 100 B.R. 992, 995 (N.D. Ill. 1989) (citing Record Club of Am. v. United Artists Records, 80 B.R. 271 (S.D.N.Y. 1987). The issue of intent is a question of fact that also implicates questions of law and must be demonstrated by clear and convincing

13

evidence.  See In re Smith, 586 F.3d 69, 73 (1st Cir. 2009). Crawford-El v. Brotton, 523 U.S.

547, 585 (1998) (adopting the clear and convincing standard for improper intent with regard to

damages actions against government officials); Cruzan v. Dir., Mo. Dept. of Health, 497 U.S.

261 (1990) (upholding the clear and convincing evidence standard with regard to intent to refuse

medical treatment); Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30 (1989) (requiring

an intent to abandon a child to be shown by clear and convincing evidence). But see Vance v.

Terrazas 444 U.S. 252 (1980) (holding that intent to relinquish citizenship must be proven by a

preponderance of the evidence); Stamat v. Neary, 635 F.3d 944 (7th Cir. 2011) (stating that with

regard to Section 727, many circuits require a trustee to prove fraudulent intent by a

preponderance of the evidence).

The ultimate inquiry in ascertaining a party's intent requires an examination of the facts

and circumstances. Cannon v. Comm'r of Internal Revenue, 949 F.2d 345, 350 (10th Cir. 1991).

As the purpose of Section 553(a)(3) is to prevent deliberate manipulation by creditors, "[t]here

must be facts to show an intent to manipulate the balance". Energy Co-op., 100 B.R. at 995. See

also Dillard Ford, 940 F.2d. at 1513 (holding that a creditor did not incur debt for the purpose of

set off where it stopped payment to the debtor); In re United Sciences of Am., Inc., 893 F.2d

720, 725 (5th Cir. 1990) (affirming lower court's holding that acting in the ordinary course of

business to protect its rights was not for the purpose of obtaining setoff). But see In re Bohlen

Enter., Ltd., 859 F.2d 561, 568 (8th Cir. 1988) (holding that the debtor's deposit of funds was

not in the ordinary course of business and was for the purpose of creating a setoff right for the

bank).

In evaluating intent under Section 553(a)(3), courts consider factors such as whether the

whether the debt was incurred in good faith and in the regular course of business. In re Kroh

14

Bros. Dev. Co., 86 B.R. 186, 191 (Bankr. W.D. Mo. 1988) (listing factors considered in determining whether a bank accepted a deposit for the purpose of obtaining a setoff right); In re Union Cartage Co., 38 B.R. 134, 139 (Bankr. D. Ohio 1984) (same). Where an entitlement to funds arises by legal obligation, intent to obtain a right to setoff is not present. In re Ogle, 2011 WL 666359, at *4 (Bankr. D.S.D. Feb. 14, 2011); Summit Fin. Svcs., 240 B.R. at 120 (noting that while a bank set off an account upon discovery of a debt owed by the debtor, it did not receive deposits, i.e. incur debt for the purpose of setoff).

Here, the parties do not dispute that a valid contract existed. Importantly, both parties concede that Perdue was obligated to purchase DDGS from the Debtor in order to fulfill third-party resale contracts. Furthermore, the parties do not dispute that Perdue has a valid right to setoff under Section 553 of the Bankruptcy Code with respect to the shipments invoiced prior to February 28, 2011. The parties only dispute whether Perdue stopped its payments for DDGS on February 28, 2011, and thereby intended to increase its setoff right. On February 28, 2011, when the Debtor notified Perdue that it would immediately cease the purchase of corn because the plant was not profitable, that constituted a breach of the Feedstock Supply Agreement. Under the Master Agreement, a breach of any of the Agreements constituted a breach of all of the Agreements and entitled Perdue to exercise its remedies. Accordingly, upon notification that the Debtor would cease the purchase of corn, the Debtor was in breach under the Agreements and Perdue became entitled to exercise its remedies under the Agreements and under the law.

In addition, the Debtor's notification of its shutdown had the foreseeable result of ceasing the production of DDGS, which the Debtor knew would impair Perdue's ability to perform under the third-party contracts. While the Debtor's decision to cease production may be justified by its business judgment, the Uniform Commercial Code notes that simply ceasing production due to

unprofitability does not justify a failure to follow agreed upon cancellation procedures that were prescribed in the contract. N.C. Gen. Stat. § 25-2-306 cmt. 3. Courts have held the same.

Pursuant to N.C. Gen. Stat. § 25-2-610, and the doctrine of anticipatory breach, upon notifying the Debtor of its intention to cease payments for the DDGS, Perdue was within its rights to suspend its performance under the contract. Mr. Bradley, the Debtor's Chairman of the Board, acknowledged such rights in his testimony. Moreover, by accepting the DDGS from the Debtor and crediting it against the amount owed, Perdue was fulfilling its duty to mitigate its damages as opposed to obtaining DDGS from alternate sources and potentially increasing its consequential damages. Rather than limiting its exposure to consequential damages under the Co-Products Agreement, the Debtor explicitly agreed to accept responsibility for any damages Perdue would incur from the Debtor's breach. Accordingly, in ceasing payments for DDGS to the Debtor while continuing to accept shipments of DDGS for the purpose of fulfilling third-party contracts, Perdue was acting in good faith and within its contractual and statutory rights.

In light of the Debtor's acknowledgment of Perdue's contractual right to cease its payments, the Trustee has not sustained the burden of proving an intent to build up a setoff right. Perdue exercised its right to suspend performance immediately upon notification of the Debtor's breach. The Trustee failed to provide sufficient evidence that Perdue knew, when it ceased making payments, that the Debtor would file for bankruptcy. In fact, the evidence indicates that no party knew with any certainty that the Debtor would, in fact, file for bankruptcy. The Trustee's evidence demonstrates that Perdue was informed of the possibility of bankruptcy at a meeting held more than a week following the notification of the shut down. In the meantime, the Debtor continued to ship the DDGS to Perdue, knowing that Perdue would not pay for it.

16

The Trustee has failed to show a deliberate manipulation by Perdue to build up a setoff right. The appropriate inference is that Perdue was simply acting in the ordinary course of business, in good faith, pursuant to its contractual rights and applicable law.

## V.   CONCLUSION

Upon the presentation of the Trustee's case, the Trustee failed to show, by clear and convincing evidence,[3] that Perdue's actions in ceasing payments for the DDGS were done with the intention of building up a setoff right rather than simply exercising its contractual and statutory remedies.   Therefore, the Trustee has failed to sustain her burden of proving that Perdue lacks the right to setoff pursuant to Section 553(a)(3), and judgment must be entered in favor of Perdue as to Count 7 of the Amended Complaint.

This opinion constitutes the Court's findings of fact and conclusions of law. The Court will issue a final judgment as to all counts of the Amended Complaint.

---

[3] Nor would the Trustee's evidence meet the lesser standard of a preponderance of the evidence.